All right, our final case this morning is 22-5069 Wise v. Caffey and see we're in split time on the for the appellant. Okay, Mr. Coldiron, you go first. May it please the court, I've prepared some short remarks here and I am going to be splitting my time so I'll be brief. Well Don Caffey... Please identify yourself. Excuse me, please enter an appearance. Oh, Seth Coldiron appearing for appellant Don Caffey. Thank you. While Don Caffey and Jesse Wise present contrasting viewpoints, this case is not so much about who one may feel inclined to side with. This case concerns something more salient. It champions a greater cause. A some respects is underappreciated, perhaps not in any obvious sense but in a very didactic way. Our Supreme Court's decision in Kingsley, a pretrial detainee may establish a 14th Amendment excessive force claim by presenting objective evidence that the challenge conduct is not rationally related to any excessive in relation to that purpose. However, the district court found that Caffey's use of force was unnecessary because Wise was restrained, which suggests that there could never be any legitimate purpose for using force on an restrained detainee. The district court found support for this proposition in a series of Fourth Amendment cases which hold that when force is used, the continued application of force after the person is restrained, subdued, and no longer resisting violates our Constitution. Clearly that is this court's precedent, but that is not this case. Wise contends that Caffey's single knee strike, which lasted all of 15 seconds and left him unharmed, violated the 14th Amendment. A rule prohibiting all use of force on restrained detainees strays too far from the constitutional protections at issue. While the Fourth Amendment concerns those liberty interests that a free citizen enjoys prior to arrest and detention, the detainee's interest under the 14th Amendment concern his or her right to due process prior to punishment. Why wouldn't there be a fact question at least regarding excessiveness in these circumstances? And I agree there's going to be, in what we presented, especially in the briefing, there seems to be a dispute over some of the factual issues, but I think more from my perspective that the dispute raised is based upon the misapplication of the proper legal analysis, and that misapplication of the Fourth Amendment to this 14th Amendment claim then infected the factual analysis. I hope I understood and answered the question. If we have jurisdiction to consider the matter, if the District Court concluded there's disputed facts on the Kingsley factor, then we defer to that determination unless you can point to a clearly established case that would apply here, right? Well, I think that when we talk about the factual issues that the court has raised, and he does find that there was a constitutional violation, and he draws inferences based on a Fourth Amendment, right, analysis. And so the only way he can make that, the court can make that determination is by relying on Fourth Amendment precedent rather than 14th Amendment precedent. So it's a misapplication of law, right, that ends up getting to the factual conclusion that raises the issue. I know that sounds backwards, but that is the way it is. Had the court applied the proper standard, then we would never have been here because you can't conclude under the proper standard that there's an excessive use of force. Well, isn't Kingsley the proper standard? It is. And didn't the court apply Kingsley? It did not. It applied McCoy and Bennett. Well, hasn't this court drawn on a Fourth Amendment precedent in analyzing Kingsley claims? I don't believe that it has. Many of the, in fact, I don't think there's a published decision by this court since it's in the state of Booker, which is a pre-Kingsley case. So I don't know that there is published Cole Bruno's decision, but I'm sorry, Cole Bruno's post-Kingsley, and it applies Kingsley factors. Cole Bruno versus Knightley. But that's, that's post-2018 in this case, correct? So that's the problem on this case. Well, at least on prong one, it's fair game, isn't it? We're not talking about the second prong. You're arguing the constitutional violation right now, aren't you? So, maybe I'm confused, but the position that I've taken and what I'm arguing here is that if you apply the Fourth Amendment standard, you, then you're obliterating or taking away that state interest in preventing the harm that Cathy was engaged in. And so, by removing that self-harm, now the force has no basis for any objective use. There's no reasonableness to it at all, which makes it excessive, regardless of whether or not Wise is in handcuffs. And so, the Fourteenth Amendment's focus on the state's interest in on, in this case, the state's interest is the inmate's safety, isn't the detainee's safety, right? It's Wise's own safety. And if you remove that from the analysis, and you only look at the fact that he's handcuffed, and you go to cases like McCoy or Bennett or in this state of Booker, you're going to fall into the trap of removing that Fourteenth Amendment interest and focusing solely on a Fourth Amendment one. So, I've gone over, actually, the amount of time I was going to be allotted, and I will cede the floor to my co-counsel. Thank you. Thank you, Your Honor. It's Andy Artis for the Sheriff, Brett Bowling, in his individual capacity. In this case, we had a policy. Mr. Caffey violated the policy. We enforced the policy and fired Mr. Caffey and recommended that he be criminally prosecuted. The policy and issue is the use of force, and it says the amount of force will be the least possible and then as a last resort. If at all possible, non-forceful means such as verbal intervention, negotiation, a show of force will be attempted before any using force as a last resort. Use of force for punishment or appraisal is strictly prohibited. Verbal provocation does not justify use of force. Every reasonable effort will be made to prevent any situation which requires the use of force. There is no way a reasonable person could read this policy and determine that it is okay to be an inmate in the face who is sitting on the ground with his hands cuffed behind his back. Specific or extensive training hardly seems necessary for a jailer to know that giving a knee strike to the head of an inmate sitting on the floor with his hands cuffed behind his back is inappropriate behavior. Jordan Lundstrom is the jailer who the district court said had not received use of force training. He is the one who reported the violation and the next morning he knew it was a violation. It does not take much training on policy to know you are not supposed to knee strike an inmate in the face who is sitting with his hands cuffed behind his back. The policy did not need to be more specific in this regard. So your position is that Mr. Caffey committed a constitutional violation? Well, for sure he committed a policy violation. Did he commit a constitutional violation? I believe he did, actually. All right, and then you've got the policy argument and then there's no training. Well, that's so, with regard to training. Yeah, let me see. What was it called? The cleat training. Oh my God, yeah, that's way more extensive than any jailing training that's ever provided. He was an actual Manford police officer when he was hired. Yeah, that wasn't my question. My question was did he get any training from the jail itself? Absolutely he did. He received cleat training. As I said, he was a Manford police officer when he was hired. He had 371 hours of cleat training, including use of force, these strikes, and when to use them. And from his cleat training, Caffey testified that he understood he was required to use the minimum amount of force necessary. Well, that's the cleat training. Did the jail provide any training? Absolutely they did. He signed a code of conduct saying he would treat all inmates in a respectful manner. He received two weeks of on-the-job training. Then he received a certified annually on the Oklahoma Jail Standards. The Oklahoma Jail Standards have a policy or have a requirement on use of force that says use of force by staff shall be restricted to instances of justifiable self-protection of others, protection of property, and prevention of escape, and shall only be to the degree necessary. He received what we call jail school training. In 2018, he had training on security procedures, supervision of prisoners, prisoner rules and regulations, rights and responsibility of inmates. Again, the Oklahoma Jail Standards, basic jail security principles, ethical behavior for correctional officers, and dealing with stress. Wasn't there, I thought there was some testimony that he had not reviewed or received the specific policy applicable, you know, bowling's policy that's applicable to this facility. Well, the policy that's mentioned in the jail standards is, dovetails with the policy of the jail. Furthermore, the plea training that he received said that he was required to use the minimum amount of force necessary to main control of a given situation. Was he trained on this facility's use of force policy? Yes, he was. In his two weeks and on his on-the-job training, and that is the same policy that requires the amount and type force used will be the least possible, and then only as a last resort. So, does the Lyman report create a fat question here? I'm sorry? The Lyman report that disagrees with the position you're advocating? Maybe I have to explain more Wasn't there an expert report? Oh, well, the Lyman report is just saying that the policy needed to be more specific. However, I think that again, it's, you know, we learn in the third grade you don't hit somebody in the face when their hands are behind their back. I mean, this is not something that you need more specific. The policy doesn't say don't pull somebody's fingernails out or don't stab them with a knife. You know, to talk about needing more and more specific training on it, when it's very clear on its face that you use the least amount of force possible and you try all these other things first and you don't react out of anger and you don't react out of verbal provocation. And so I think the evidence is that he had lots of training, more so than any other jailers would have, because he's coming out as a police officer where he received way more training than most jailers do. And furthermore, the one person who reported him was someone who the court found didn't have any training at all, and it was completely obvious to him that what he did was a violation of the policy. And so the need for more training I don't think was there, and I think it was wrong for the court to deny qualified immunity on this. I guess the next thing, before I run out of time, is to talk about the case for the Keith v. Corner case and try to tell you how it was distinguished here, and I'll try to do that in a minute. In Keith, there were numerous instances of employee sexual misconduct ranging from undue familiarity with inmates to confirmed sexual assault. Here, there's no evidence of numerous instances of excessive force. In Keith, there was evidence of limited investigation. Here, Kathy was investigated immediately and terminated. In the Keith, there was evidence of lax discipline and employee sexual misconduct. Here, there's no evidence of tolerating excessive force. He was fired and recommended criminal charges. So Keith is premised on a widespread and persistent pattern of misconduct, and here, this was an isolated incident involving one inmate. And with that, I'll reserve my time if necessary. Thank you. You can press 10 minutes into seven minutes. All right, Mr. Warren. Good afternoon, and may it please the Court. Jack Warren on behalf of the Plaintiff Appellee, Jesse Wise. So obviously, we have two separate appeals here, and I think it's probably necessary to address Mr. Kathy's appeal first, being that the violation of the 14th is the crux of all of the claims in this case. And I first want to point out that Judge Tinkovich, you mentioned this in earlier, that we don't believe that the court even has jurisdiction to consider Don Kathy's appeal. The entire appeal is riddled with his disagreements with the court's factual determinations, mainly whether or not Jesse was resisting at the time that this incident happened. Yeah, the district court granted summary judgment in your favor. Sure. So we can review that de novo, right? Sure, and I'm not so much, the problem is he's, they're saying that he goes so far as discussing the blatant misrepresentation doctrine as if all of the facts go against the fact that he was resisting, which is just not the case. In this case, every single person that's involved has said that Mr. Wise was not resisting, he was handcuffed, and that the use of force is excessive. And when I say everyone, I mean quite literally every single person except Don Kathy. And you can take it with a grain of salt because Don Kathy didn't even include a reference to the knee strike in his report afterwards as if to try to hide it from review. Now, I want to move to the 14th Amendment versus 4th Amendment argument. First, it's perplexing that Kathy is advancing this argument that the district court supplanted the 14th Amendment analysis with a 4th Amendment analysis. The court doesn't even reference Graham in its opinion. It is only evaluating the Kingsley factors. And Kathy goes to great which is included in one of the Kingsley factors. And the court specifically addressed that factor in its opinion. The court says on page 9 of its order that, quote, there was no security problem at issue under these circumstances and certainly not a severe one where Mr. Wise was already handcuffed and no longer resisting. It seems slightly disingenuous to me for Mr. Kathy to argue that his use of force was needed in this case to provide some kind of institutional security. It actually even suggests that it was for Mr. Wise's own benefit. But he doesn't provide any reason why deploying the knee strike, when he did, would do anything to provide any kind of institutional security. He was handcuffed, seated on the ground. He was not a risk to himself, not a risk to others. There's there's no risk to the institution or the security of either the officers or the jail and writ large. And I think it's important to point out too, Booker, which is a case authored by Judge Matheson, that discusses the 14 First Fourth Amendment, I understand it was it was done right before Kingsley, but I still think that it's extremely helpful because in that case the court in Booker was first clear that striking a pretrial detainee that's that's not resisting and handcuffed is a excessive use of force under the 14th Amendment. But it also uses and relies on Fourth Amendment cases. Now I want to be clear that Mr. Wise, we're not contending that the Fourth and Fourteenth Amendment standards are the exact same. They're clearly not. But there's a lot of significant overlap between the same between the two. In fact, in Booker, the the opinion says, quote, defendants assert that plaintiffs cannot rely on Fourth Amendment case law to show that any violation of Mr. Booker's constitutional rights was clearly established. Shortly thereafter, there's a short sentence that just says the defendants are mistaken and relies on numerous Fourth Amendment cases because they provide the notice that one would need because of the And I think that the reasoning in Booker goes to the clearly established prong, because not only does Booker clearly establish the use of force is unnecessary, but it shows that Fourth Amendment cases can also provide adequate notice as well. In the court, the District Court, too, cited to the sliding scale approach that the Tenth Circuit takes in these cases where the more obvious the unreasonable force is, the less specific a case needs to be. And I can't think of a case, well, I'm sure there's probably one out there, where a use of force is this obviously unnecessary. I mean, as admitted by one of the co-defendants here, Mr. Bolling, the force was obviously unnecessary. And any of these, whether it be a Fourth Amendment or the Fourteenth Amendment, gives notice that striking a subdued, non-resistant inmate is a violation of that person's rights. And I don't think that, I think that Cathy is trying to misconstrue the District Court's findings to try and shoehorn in some kind of legal argument between the Fourth and the Fourteenth Amendment. I just don't think it's there. And now I guess we need to move on Bolling, I think there's a couple things that are important to note. And one is that the plaintiff really has three theories of Bolling's supervisory failures. One being the written policy, which you guys discussed, and the lack of training. And also his lack of supervision over Defendant Cathy. And while they're different, they kind of dovetail. And one of the things you as represented by counsel, essentially says, use the least amount of force possible. But it doesn't provide any specifics regarding how, when, techniques. And that policy on its face, you just suggested that the use of force was obviously unconstitutional. Why doesn't that cut in favor of Bolling's argument that some things you just don't need to train? Because this case, Cathy wasn't, he believed he was acting within the policies. I mean, you heard him say first that using institutional security, that this is something that needed to be done. He clearly didn't understand. And you noted earlier, the numerous times that he cited... He was the only one. Sure. Based on this record. That's true. And we still believe, though, that had he received any training, he would have at least known how to deal with an inmate that he believed to be resistant. And that, absent that training, and absent any written guidance, it created this space where he was unequipped to handle the situation that he was presented with, with Mr. Wise. And to the extent that there's pushback on the obviousness, that's why the supervisory failures, in the sense of the numerous violations of jail policy, is relevant. Because if it were true that the obvious nature of this constitutional violation, that any training wouldn't have made a difference. What would have made a difference is if Sheriff Bolling had supervised him throughout his, you know, year and a half long time there, and realized that he had a consistent pattern of violating jail policies, but didn't do anything to correct that. Were those other violations use of force? No, most of them were not. Now, Bolling goes to great lengths to point out that none of them were. There was one, and it was actually one that was just a couple months before he used the knee strike on Mr. Wise, where he was found to have, I'm going to read the exact line here, it's on JA 1431, he was reprimanded for, quote, failure to follow policy 9-1, which is the use of force policy at the jail, because he failed to, quote, open the feeding port to allow an inmate to comply before using physical force. And that was on July 20th of 2018. He did, the knee strike occurred on October 14th of 2018. So there is that, but more importantly, there's a consistent pattern that Bolling had created, which dovetails, which we can discuss here in a second, with the Keith case, where there's a pattern in an atmosphere that's created that employee misconduct is not dealt with or handled. But how can we infer that based on the statements, testimony, the other officers involved in this incident, that seems to actually support an adequate training regime rather than, and it makes Mr. Wise stand out as a rogue versus the norm in the facility. Well, what I'm referring to here is that starting on August 8th of 2017, Mr. Bolling was reprimanded 12 separate times for violating jail policy. Numerous of those violations, he responded that he didn't have the jail policies and didn't think the policies, he violated the policies. Throughout that time, more training was not offered. And in fact, now's a good time to say, the facts of the case are that defendant Caffey testified he did not receive any training at the jail. You guys were asking counsel about that. He testified he did not receive any training at the jail. He received training at Cleet years prior, but nothing at the jail. And even in the two-week period that he was shadowing, he also testified directly that he did not receive any use of force training at that time. But throughout this time, there's a clear pattern that he's not capable of following the jail policies, but they're never dealt with. In fact... The sheriff was aware that the written policies were not given to him? Well, as far as, are you referring to whether or not Sheriff Bolling himself had a subjective knowledge as to whether or not... Well, Mr. Caffey says I never received the policies. Your claim is against the sheriff. Would the sheriff be the person who handed him the policies or would it be somebody else? Sure, and I'm not... Any evidence on that? There's not evidence on that, but the reason for that isn't so much to say that that was the violation when he didn't hand him the policies years prior. The violation is that he was aware that he didn't have the policies and didn't know about the policies, but didn't do anything... He was? What evidence is there of that? Well, that in his response to these written reprimands on August 8th of 2017, which is far beyond this, he was reprimanded and Caffey writes in response to that reprimand that he had not received the policies and procedures. He writes that to the jail, but nothing was ever provided after that. So... It sounds more like it would go to a Monell claim than an individual supervisor. Well, I do think it goes to a Monell claim, which we have pending. It's at the District Court. Right, but we don't have that here. Sure. And let me just say, you say they were the... You had the three theories. The District Court only relied on the first two, correct? I disagree with that. I think the District Court relied heavily on the repeated policy failures. But did it rely on it for purposes of the policy and the training, as opposed to overall supervision? Did it break out your third theory? I think it didn't necessarily break it out as specifically, but it cited the repeated reprimands as evidence. Let me just ask you, on the clearly established law front, we have your claim for individual supervisory liability. Case law in that area isn't as developed as it is for Monell and individual liability. And my question is, where's the clearly established law? Where is your factually analogous case to show that the elements of causation and deliberate indifference? Sure, so I... I really have a question whether the policy, which is general, not specific, but did it cause this to happen? So you have a case that would put the sheriff on notice that it would cause this to happen. Sure. So I think, first of all, in regards to the policy, it needs to be read somewhat in conjunction... I'm not talking about the policy. Where's your law? Sure. So regarding the specific written policy failure, there... there is... we were not able to identify a specific case that said this specific written policy is unconstitutional as a matter of established law. But the purpose of the written policy is to be read in conjunction with a general policy coupled with a lack of training is where the problem arises. If there is a general policy... So now your theories one and two have merged. They... they... they... they... they do merge in so many aspects. All right, fair enough. Give me a case. So... I'm looking for a case. I want to get to Keith, because I think... Okay. Is Keith your case? Keith is the case. Anything else? Because you both briefed Keith and we've read them. Sure. But have you got anything else? Sure. Besides Keith, no. Because the... to be completely honest, in regards to the training, here, Kathy had regarding supervisory failure to completely not train, which, again, on the sliding scale, I would argue is quite obvious and needs less specificity. But yes, the... Keith is discussed at length in the briefing, so... All right, counsel, I think your time has expired. Thank you for the helpful remarks. All right, thank you. The case... counsel are excused, then, and the case is submitted. Appreciate your participation this morning. The case will be in... the court will be in recess until 8.30 tomorrow morning.